## In re GROSSMAN.

(District Court, E. D. Michigan, N. D. July 11, 1901.)

1. BANKRUPTCY—DISCHARGE—CONCEALMENT OF ASSETS AND FALSE OATH.

A bankrupt had been engaged in business as a retail merchant. On November 23d he gave a chattel mortgage on his stock to a trustee for creditors, who took possession of and sold the same. The stock was inventoried by the trustee at $2,560. The evidence showed that on July 1st, preceding, the stock amounted to about $4,009, and between that date and the giving of the mortgage he had purchased additional stock to the value of $7,457 on credit, on which he had not paid to exceed $200. His bank book also showed deposits during that time of about $3,400, of which about $3,100 had been checked out. Neither the checks nor stubs were produced; nor did the bankrupt explain what use was made of the money, or what had become of the goods. There was also other evidence in the record which tended to discredit his testimony and his business integrity. *Held*, that such evidence, together with his failure to sustain the burden placed upon him by Bankr. Act 1898, § 7, subd. 9, of making a full and frank disclosure as to his business transactions, justified a finding that he had property at the time of his bankruptcy which he concealed, and that he knowingly and fraudulently made a false oath to his schedules, in which he stated that he had no property above his exemptions, and warranted the refusal of his discharge.

2. SAME—FEES OF REFEREE—HEARING ON APPLICATION FOR DISCHARGE.

Where objections to a bankrupt's discharge are referred to a referee for hearing, he is entitled to a reasonable allowance for his services, in addition to the fees allowed him by the bankruptcy law.

In Bankruptcy. On review of decision of referee holding bankrupt entitled to a discharge.

Isaac A. Gilbert, for petitioner.

Pierce & Kinnane, for opposing creditors.

SWAN, District Judge. Specifications in opposition to the discharge of the bankrupt were filed by several of his creditors, and on March 12, 1900, were referred to the referee. On April 2, 1901, on cause shown, the creditors were permitted to file amended specifications. These were as follows:

"(1) That said bankrupt, in his petition and schedule filed in this cause, and in his application for a discharge thereof, did knowingly and willfully make false oath and false oaths, in this: that the said bankrupt in said schedules and petitions filed herein did make oath that at the time of filing

said petition in bankruptcy he had no assets, whereas in truth and in fact he, the said bankrupt, had and still has in his possession and ownership money and property to the value of $5,000. (2) That said bankrupt, in his schedules and petition filed herein, and in his sworn testimony taken before the referee, did knowingly and willfully make false oath, in declaring under oath that he had no assets or property, whereas in truth and in fact he had and still has, in money and property taken, received, and abstracted from his store and stock of goods and business owned and operated by him previous to filing said petition in bankruptcy, assets to the amount of $5,000, which the above-named objectors are not able to more particularly describe."

The contest over the bankrupt's discharge was had over these two specifications, the prior objections being practically abandoned.

Prior to January 1, 1898, the bankrupt had been in business in Bay City for upward of five years as a retail dealer in clothing, boots and shoes, and men's furnishing goods. He testifies that he can neither read nor write, except to write his name, and there is no showing to the contrary. His principal business man, the bookkeeper, was one Simon Grabowski, who apparently continued with him until about January 1, 1899. On or about January 31, 1898, the bankrupt made a statement of his financial condition to R. G. Dun & Co. This statement was made out by Grabowski, but signed and delivered by the bankrupt to Dun & Co. It reads as follows:

"M. Grossman, Dealer in Clothing, Hats and Caps, Gent's Furnishing Goods, Boots and Shoes, 906 Water Street, Bay City, Mich., Jan. 4, 1898.

| | |
|---|---:|
| Stock on hand | $5,467 34 |
| Cash on hand and in bank | 1,011 72 |
| Accounts | 175 00 |
| Fixtures | 80 00 |
| Resources | $6,734 06 |
| Liabilities | 2,075 29 |
| Balance | $4,658 77 |

"[Signed]                    M. Grossman."

Upon his examination his bank book was put in evidence, from which it appears that on January 1, 1898, his balance in the bank was $481.92. On the 1st day of November, 1898, according to the bank book, his balance was $273.23, and his monthly payments from said bank account in 1898 to November 1st were as follows:

| | |
|---|---:|
| January | $1,402 60 |
| February | 542 40 |
| March | 984 27 |
| April | 1,573 32 |
| May | 757 58 |
| June | 1,485 66 |
| July | 787 18 |
| August | 1,135 48 |
| September | 718 48 |
| October | 456 10 |
| Total | $9,843 21 |

Between July 1 and November 23, 1898, the proofs show that he received new goods to the amount of $7,457 at invoice prices, and that his payments on account of such goods were less than $200. November 23, 1898, he filed a chattel mortgage running to one Orr as trustee,

purporting to cover all of his property and to secure all of his debts. In this chattel mortgage his indebtedness is scheduled at $11,505.83, including $1,250 to his wife and $2,230 to his mother-in-law, Mrs. Kate Roth. The trustee, Mr. Orr, took immediate possession of his property, inventoried and appraised it at once, and the value of the stock and fixtures was appraised at $2,560. The trustee sold under the mortgage, and realized from the stock and fixtures the sum of $1,985. The chattel mortgage sale was held December 23, 1898, and the property was purchased by the bankrupt's mother-in-law. The business has been carried on in the same store from that time until the present, with the bankrupt in full charge and management. The testimony shows that the stock of the bankrupt in January, 1898, and in July, 1898, amounted to about $4,000 in value. The bankrupt filed his voluntary petition in October, 1899, in which he declared that he had no property except such as was exempt by law. In his schedules he sets forth his liabilities as $10,386.14. These were almost entirely for goods purchased after July 1, 1898, excepting the sums of $1,095.05 and $1,986.48, which he alleged were loans from his wife and mother-in-law, respectively, made in 1895 and in 1897. The only book of account sent up with the testimony by the referee is the bankrupt's bank book, from which the following facts appear: July 1, 1898, he had a balance of $124.74, and his total deposits during the month were $895.98. At the end of the month the balance to his credit in the bank was $98.80. In August, 1898, he deposited $1,370.46. Of this sum he paid out in August all but $234.84. He deposited during September $772.31, of which in that month he paid out all but $53.73. In October, 1898, he deposited $729.23, of which he paid out in that month $273.23. November 8th he deposited $50; November 14th, $39.65. At this date his bank book transactions seem to have been closed. From the foregoing it will be seen that he received and deposited from July 1 to November 14, 1898, $3,409.86; that he paid out during the same time $3,097.42. Not a dollar of the latter amount seems to have been paid for goods purchased during the period mentioned, nor does it appear that the funds in the bank were used to pay creditors, or for what purpose the sums drawn were paid. Grabowski, his bookkeeper, testifies, from the merchandise accounts which were produced before the referee, to the substantial correctness of the indebtedness for merchandise purchased and delivered to the bankrupt after July 1, 1898. The bankrupt does not deny the correctness of any of these claims, or pretend to have paid any of his creditors except the Peerless Manufacturing Company, which seems to have received about $145 for goods sold and delivered to the bankrupt after July 1, 1898. No attempt is made by the bankrupt to account for the disposition of the moneys, the payment of which is evidenced by his bank books, or to explain the disappearance from his assets of the difference between his stock on hand July 1, 1898, with his subsequent purchases of $7,457, and that covered by the chattel mortgage, which was inventoried at $2,560, as stated. If, as the referee finds, he had his stock of $4,000 worth of goods July 1, 1898, and added thereto by purchases of goods of the value of $7,457, it is obvious that he must

have had a stock of value between eleven and twelve thousand dollars during the period between July 1 and November 23, 1898. Whether this stock was sold in great part, and the proceeds deposited and used by the bankrupt, or what became of it, does not appear. The checks drawn by the bankrupt upon his bank account were not produced. The check stub book he had destroyed. The books of account kept by Grabowski, who described himself as a "general utility man," and disclaimed competency as a bookkeeper, fail to afford any explanation for the disappearance of these goods from the bankrupt's assets, or their avails if.sold. The bankrupt's testimony, making due allowance for the fact that he did not keep the books and was unable to read and write, is very unsatisfactory. He disclaims remembrance of the most important business transactions, which must have been known to him, or should have been evidenced by entries on the books. Grabowski testifies that such entries were made thereof as were directed by Grossman. It further appears that prior to July 1, 1898, the bankrupt had made a statement to R. G. Dun & Co., which made no mention whatever of the alleged indebtedness of the bankrupt to his mother-in-law or his wife, and claimed that his net assets were about $4,600. He seeks to evade responsibility for this statement by the fact that it was made out by Grabowski, but it is scarcely credible that Grossman signed it, as he admits he did, without knowing its substance. It is difficult to reconcile the omission in his statements of his alleged indebtedness to his mother-in-law and to his wife with the acknowledgments in the schedules attached to his voluntary petition that he was in their debt to the amount of over $3,000, which indebtedness was created in 1895 and in 1897. While this in itself is not ground for refusing his discharge, it discredits his testimony, and casts a strong suspicion upon the rectitude of his subsequent business career, and his disposition of the large purchases of goods made after July 1, 1898. The burden of showing a lawful disposition of his property and its proceeds, and of explaining the concealment until he filed his petition in bankruptcy of his alleged debts to his wife and mother-in-law, and generally of making a full and frank disclosure of his pecuniary transactions, was upon the bankrupt. This is the express requirement of section 7, subd. 9, of the bankruptcy act. He has failed to perform this duty, to produce his books for examination by his creditors, or to offer any explanation whatever of the disposition of his property and its avails. It is impossible to learn from his testimony what he did with the $7,457 worth of goods bought after July 1, 1898, or the $4,000 of goods in stock before that time. Accepting the facts as found by the referee, from whose careful report I have quoted largely, I am compelled to differ from him as to the effect of the testimony. I cannot believe that nearly $12,000 worth of goods could have honestly dwindled to a stock of $2,560, as evidenced by the inventory of Mr. Brakie, the trustee under the chattel mortgage, between July 1, 1898, and November 23, 1898, without the knowledge and active aid of the bankrupt. If he sold goods in that time to the amount of the difference between these sums, his books should show the sales and what he did with the proceeds. He

vouchsafes no explanation of this shrinkage in his stock, and admits no additions to his bank account which would throw light upon the matter. He must have had the goods or their proceeds when he filed his petition. The only conclusion of law which can be drawn from these facts is that the bankrupt knowingly and fraudulently swore falsely that he had no assets, and therefore is not entitled to a discharge. In re Dewell, 2 Nat. Bankr. N. 598, 100 Fed. 633; In re Finkelstein, 2 Nat. Bankr. N. 839, 101 Fed. 418; Knitting Works v. Schreiber, 2 Nat. Bankr. N. 899, 101 Fed. 810; Id., 4 Am. Bankr. R. 299, 101 Fed. 810.

In reference to the compensation to which the referee is entitled, it is clear that the duty he has performed in this matter is outside of his official position, and is that of a special master. Fellows v. Freudenthal, 3 Nat. Bankr. N. 97, 102 Fed. 731. It appears that the examination upon the reference had upon the bankrupt's application for a discharge occupied three days. For this the referee should be allowed the sum of $25, and his necessary disbursements for stenographer's fees at the usual rates for taking and reporting the testimony.

An order will be entered in accordance with the foregoing opinion.